UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                              CASE NO. 05-21605

ROY FRISCHHERTZ CONSTRUCTION                                        SECTION "B"
COMPANY, INC.

    DEBTOR                                                         CHAPTER 11
*************************************************************************
ROY FRISCHHERTZ CONSTRUCTION
COMPANY, INC.
    Plaintiff

VERSUS                                                              ADV.P.NO. 06-1011

THE AUDUBON COMMISSION
    Defendant

## MEMORANDUM OPINION

This matter came on for trial on March 26-29 and April 5, 2007 on the complaint of the debtor, Roy Frischhertz Construction Company, Inc. ("RFCC"), against The Audubon Commission ("Audubon") and the counterclaim thereto. For the reasons set forth below, the court finds that RFCC properly terminated the contract on October 4, 2005. The court further finds that Audubon owes RFCC $161,427.50 plus interest at the Louisiana legal rate from October 4, 2005 until paid. Audubon's claim for breach of contract is dismissed. Because RFCC did not breach the contract, RFCC is not liable for costs of completion.

**I.    Background Facts**

On April 5, 2005 RFCC, a general contractor, and Audubon entered into a contract for the construction of the Audubon Café in Audubon Park, New Orleans, Louisiana. The contract

was bid and awarded in accordance with the Louisiana Public Bid law at a price of $1,698,816.[1] The contract consisted of several form documents: A101-1997, Standard Form of Agreement Between Owner and Contractor,[2] ("agreement") A201-1997, General Conditions of the Contract for Construction,[3] ("general conditions") and Supplementary Conditions, Document 00760-17 through 00760-17 ("supplementary conditions").[4]

RFCC commenced work on the project on April 25, 2005 and was still working when Hurricane Katrina struck the Greater New Orleans area on August 29, 2005 causing severe damage and forcing a prolonged evacuation of many areas of New Orleans. On October 4, 2005 RFCC sent a letter to Audubon terminating the contract under section 14.1.1 of the general conditions.[5] Audubon did not believe that RFCC had properly terminated the contract, so it sent its own letter of termination to RFCC on November 3, 2005.[6]

On December 6, 2005 RFCC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[7] On January 16, 2006, RFCC filed this adversary proceeding against Audubon seeking a declaratory judgment that RFCC had properly terminated the contract and seeking damages pursuant to the terms of the contract. Audubon filed a counterclaim seeking

---

[1] Louisiana's Public Bid Law is found at LSA-R.S. 38:2211 *et seq.*

[2] Debtor's Exhibit 3.

[3] Debtor's Exhibit 4.

[4] Debtor's Exhibit 4.

[5] Joint Exhibit 72.

[6] Joint Exhibit 74.

[7] 11 U.S.C. § 101 *et seq.*

damages for breach of contract and costs of completion. Audubon also joined Ohio Casualty Insurance Company as a third party defendant. The project was bonded by Ohio Casualty, which stipulated before the trial that in the event that it is found that RFCC breached the contract and Audubon is entitled to recover damages from RFCC for the cost of completing the project, that Ohio Casualty would be liable with RFCC for the damages not in excess of the penal sum of the issued bond.[8]

## II. Legal Analysis

In Louisiana parties are free to contract for any object that is lawful, possible, and determined or determinable.[9] Contracts have the effect of law for the parties.[10] Interpretation of a contract is the determination of the common intent of the parties.[11] When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.[12] Here the contract language is clear and the parties agree that it governs the dispute between them.

### A. **Termination of the contract**

Initially, the court must determine whether RFCC properly terminated the contract by its letter of October 4, 2005. Section 14.1.1 of the general conditions states:

> The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor,

---

[8] (P-144).

[9] Louisiana Civil Code Article 1971.

[10] Louisiana Civil Code Article 1983.

[11] Louisiana Civil Code Article 2045.

[12] Louisiana Civil Code Article 2046.

>Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:
>
>(1) issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;
>
>(2) an act of government, such as a declaration of national emergency which required all Work to be stopped;
>
>(3) because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate of Payment within the time stated in the Contract Documents.

RFCC asserts that when New Orleans was evacuated for the hurricane and then subsequent orders were issued by the mayor of New Orleans prohibiting or limiting the return of citizens for a rather lengthy period of time, this constituted an act of government requiring all work to be stopped for more than 30 consecutive days as set forth in subsection 2 above.

Audubon makes its argument under subsection 1 above and argues that there was no order of a public authority stopping work on the project for 30 consecutive days and that RFCC improperly terminated the contract. On August 28, 2005, the mayor of New Orleans issued a mandatory evacuation order that was to "remain in effect until the earlier of five days following the date of this issuance or the declaration by the Governor that the State of Emergency no longer exists."[13] According to Audubon, this order automatically expired on September 3, 2005. Then, on September 6, 2005, the mayor issued a second evacuation order, which was to remain in effect for 30 days.[14] On September 17, however, a re-entry plan for business owners was

---

[13] Joint Exhibit 2.

[14] Joint Exhibit 3.

enacted; that plan allowed for re-entry into certain sections of the city for business owners whose business was located in the designated section. The area within which the Audubon project was located was in an area where re-entry was permitted on September 17. From September 20-25, 2005 the re-entry plan was suspended due to the threat of another hurricane, Rita, off the coast of Louisiana. Thereafter, on September 26, 2005, the re-entry plan recommenced. Audubon argues that according to this time-line, RFCC was prevented from accessing the project only between August 28 and September 3, September 6 to 16, and September 20-25, and that none of these periods was for 30 consecutive days.

Audubon's argument fails because it denies the reality of the situation in New Orleans in the months after the hurricane, and it defies common sense. From August 27 or 28, 2005 until *at least* the end of September, if not the middle of October 2005, it was not possible for RFCC to man the Audubon project due to "acts of government" as provided for in §14.1.1 of the general conditions. The re-entry order applied to business owners within the zip codes that were authorized for re-entry, and RFCC is domiciled in Jefferson Parish, which is adjacent to New Orleans proper. Thus, RFCC was not among those permitted to re-enter the area. Even if the debtor or its principals were permitted entry, it does not mean that there was unlimited access to the job site for all of the people necessary to restart work on the job. It is common knowledge that well through early October 2005 there were numerous police and National Guard checkpoints throughout the city at which identification was checked to ensure only those permitted to re-enter were accessing the area. Further, subsection 2 above reads, "an act of government, such as a declaration of national emergency." The mayor of New Orleans proclaimed a "Hurricane Emergency" due to Hurricane Katrina, that proclamation of emergency

5

was in effect for far longer than 30 days. The court finds that under the facts of this case and with regard to the conditions that existed in New Orleans for more than 30 days after August 29, 2005 there was a sufficient basis for RFCC to properly terminate the contract under the language in subsection 2 of § 14.1.1 of the general conditions.

Audubon pursues its argument that there was no justifiable work stoppage for 30 consecutive days to its extreme by asserting that RFCC actually did work on the project during the 30 days after the hurricane because Lionel Cox, RFCC's project supervisor, visited the job site sometime in mid-September. Testimony of the witnesses shows that Cox did make one trip into New Orleans sometime in mid-September at the request of Roy Frischhertz to check on a bobcat RFCC had rented for the project.[15] Apparently the rental company that owned the bobcat wanted it back, and Cox was to determine if it could be retrieved. Cox was chosen because his son was a New Orleans police officer who could get Cox into the city past the numerous police and National Guard checkpoints that were in place to keep people out of New Orleans in the aftermath of the hurricane. Cox made only that one trip and did not perform any work on the site other than to check for the bobcat and check on the damage to the project site. The language in § 14.1.1 of the general conditions uses the capitalized version of the word "work." This indicates to the court that the defined version of Work under the terms of the contract should be used. Section 1.1.3 of the general conditions defines Work, in part, as, "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all

---

[15] Testimony of Roy Frischertz, Lionel Cox and Clyde Butler. The court notes that it would normally reference a specific portion of the trial transcript when citing witness testimony. In this case, however, no trial transcript was ordered by the parties, so the court has only an audio record of the proceedings; therefore, the court will simply give the name of the person who testified.

other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations."[16] Even the most strained interpretation suggested by Audubon would not include a one time visit to check on the bobcat and perhaps a survey of the damage to the work site as Work or resumption of Work. The court fails to see how Cox's visit constitutes Work under the definition provided in the contract.

Finally, Audubon argues that RFCC, LLC, another company owned by the principals of RFCC, did work during the period right after the storm, and that RFCC's failure to man the Audubon project was an attempt to terminate the contract in bad faith. The exhibits and testimony showed that the LLC did perform work immediately after the storm, but that the work was performed in Jefferson Parish, not in New Orleans, and that it was demolition work, which is significantly different than the skilled work required for the Audubon project.[17] Further, most if not all of the subcontractors who would have performed the skilled work on the Audubon project were not available because of the evacuation orders. For these reasons, the court finds that under § 14.1.1 of the general conditions to the contract, RFCC properly terminated the contract by its letter dated October 4, 2005.

### B. Amounts due to RFCC

Having found that the contract was properly terminated by RFCC, the court now looks to the rights of the parties under the termination provisions of the contract. Section 14.1.3 of the

---

[16] The highly qualified person called by RFCC as an expert in construction contracts opined under cross-examination that a trip to the job site [by Cox] to recover the bobcat and to assess the damage done by the storm is not "Work" according to the contract. Testimony of Dr. Jerry Householder.

[17] Audubon Exhibits 10-21; testimony of Roy Frischhertz.

general conditions provides:

> If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

RFCC, in its complaint and its amended complaint, makes claims in the amount of $984,269.32 for various things ranging from unpaid pay applications to overhead and supervision costs. In its post-trial brief, however, RFCC has modified its claim and now states it is entitled to recover $321,602.38 from Audubon for the following: 1) payment application number 4 in the amount of $28,851.50; 2) payment application 5 in the amount of $189,091.78; 3) retainage in the amount of $27,191.26; 4) Eichleay delay damages in the amount of $28,946.34; 5) overhead and profit in the amount of $52,422; and 6) legal interest on the unpaid payment applications at the rate set forth in the agreement at § 7.2.

Under section 9 of the general conditions as modified by the supplementary conditions, RFCC was to submit periodic pay applications to the architect, Bennett, who then had seven days either to certify the pay application for payment and forward it to Audubon for payment or to return the application to RFCC stating the architect's reasons for refusing to certify it. Upon receiving the pay application, Audubon was obligated either to pay RFCC within 20 days or give written reasons for failing to pay. RFCC submitted evidence showing that it had submitted two pay applications that were not paid. The $28,851.50 from payment application 4 that RFCC claims was not paid was related to change order 2. This amount was rejected by the architect because it was for work done under change order 2, which had not been approved at the time

payment application 4 was filed.[18] It appears from the testimony and evidence that this work was in fact completed although the change order was never actually signed.[19] The court finds that RFCC was properly due this amount.

Payment application 5 was initially submitted in the amount of $200,691.78. The architect certified it for payment in the amount of $125,647.[20] The parties agree that Audubon approved $125,647 for payment but never actually made the payment. At trial, there was testimony that indicated that two items billed in the payment application were not actually completed by RFCC, the concrete for grade beams in the amount of $6,000 and the concrete for top slab in the amount of $5,600.[21] Thus, RFCC reduced its claim on payment application 5 to $189,091.78. The architect deleted the $5,600 amount so that is not contested. The architect reduced the $6,000 for the grade beams concrete to $4,500; thus, RFCC should not receive credit for this $4,500 because this was not work completed. On the other hand, the architect did not certify for payment work completed in the amount of $11,429 under change order 2 that the testimony indicated had been completed although the change order itself was never signed by the owner. The other disputed amounts in payment application 5 related to stored materials. RFCC billed for several materials that were stored off-site including A/C Units at $3,600, light fixtures at $7,000, structural steel at $38,409.84, and skylights at $43,901.[22] At trial, the other deductions

---

[18] Testimony of Clyde Butler.

[19] Testimony of Clyde Butler; Joint Exhibits 36 and 60.

[20] Joint Exhibit 73.

[21] Testimony of Jessica Vinet.

[22] Testimony of Clyde Butler; Joint Exhibit 73.

9

made by the architect were not addressed. The general conditions at § 9.3.2 and the agreement at §§ 5.1.6.3 and 5.1.9 indicate that payment is only proper for materials stored at the site; written approval is required for the contractor to be able to charge for materials stored off-site. Although there was conflicting testimony as to whether the owner or the architect gave oral permission for RFCC to charge for materials stored off-site, no written approval was given as the contract required .[23] Thus, the court finds that the architect properly deleted these items from payment application 5. The court finds that RFCC is entitled to payment of the $125,647 approved by the architect, less the $4,500 mistakenly credited for the concrete for the grade beams, plus the $11,429 for work completed under change order 2, for a total of $132,576.

The contract specifies that in the event a progress payment is made late, the contractor is entitled to interest from the date payment is due at, "the legal rate prevailing from time to time at the place where the Project is located."[24] The evidence presented was not sufficient for the court to determine when exactly the payment applications should have been paid because the shortage in payment application 4 was due to change order 2 not having been approved at the time the application was submitted. The parties did not address this issue. The court finds that interest runs on both payment application 4 and the reduced amount in application 5 from the date of termination, October 4, 2005, at the Louisiana legal interest rate.

RFCC claims it should be paid the 5% retainage withheld from the contract payments which total $27,191.26. The contract provides that retainage should be paid only after

---

[23] Testimony of Roy Frischhertz that the debtor was authorized and would be paid for offsite storage. Testimony of Clyde Butler and Robert Bennett that the debtor was not authorized.

[24] Debtor's Exhibit 3, agreement at § 7.2

substantial completion of the project and after the final punch list items are completed.[25] Here, the project was not completed, and RFCC makes no argument and points to no section of the contract that entitles it to recover the retainage withheld from its progress payments. RFCC's claim for retainage is denied.

RFCC asks for $28,946.34 in delay or Eichleay damages. RFCC contends that these costs were incurred because of delays caused by Audubon and that the court should use the "Eichleay formula" to calculate the overhead costs amount. The Eichleay formula is a method of calculating overhead costs, i.e., those costs expended for the benefit of the whole business that cannot be attributed to any particular contract, that should be reimbursed if work on a government contract was suspended.[26] The formula "seeks to equitably determine allocation of unabsorbed overhead to allow fair compensation of a contractor for government delay."[27]

In order to recover overhead under the Eichleay formula, the contractor must satisfy two prerequisites: First, the contractor must show a government imposed delay which places the contractor on standby, and second, the contractor must show he is unable to take on other work while on standby.[28] The contractor bears the burden of proof on these two elements and is required to prove them both in order to make a prima facie case for recovery under Eichleay. If

---

[25] Debtor's Exhibit 4, supplementary conditions at § 9.8.4. Debtor's Exhibit 3, agreement at §§ 5.1.7 and 5.2.

[26] *Safeco Credit v. U.S.,* 44 Fed.Cl. 406, 415 (1999).

[27] *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1578 (Fed.Cir. 1994).

[28] *Safeco* at 416-17. *See also American Renovation & Construction Co., Inc. v. U.S.,* 45 Fed.Cl. 44 (1999) (to recover Eichleay damages, a contractor must show that it was on standby, required to resume work at a moment's notice, and thus was unable to take on other work; a contractor is on "standby" only when work is suspended for a period of uncertain duration and the contractor can at any time be required to return to work).

11

he meets his burden, the government must then present rebuttal evidence showing the contractor did not or should not have suffered any loss because it was able to reduce its overhead or take on other work during the delay.[29] In the instant case, RFCC presented no evidence as to either of the prerequisites for proving Eichleay damages, and the court finds that it has not made a prima facie case for recovery of damages under the Eichleay formula. This claim is therefore denied.

Finally, RFCC asks for overhead and profit pursuant to § 14.1.3 of the general conditions. RFCC presented an expert on construction contracts, Dr. Jerry Householder, who testified that RFCC was entitled to delay damages even though it terminated the contract because change order 2 extended the contract by 63 days. He further testified that the industry standard in the event of a contract termination is for the contractor to pro-rate the lost overhead and profit. RFCC does not appear to know how much it actually claims in lost overhead and profit, however, because in its pre-trial memorandum it asks for $44,364.41, in its post-trial proposed findings of fact, it asks for $52,422, and in its post-trial brief it doesn't address the issue at all. No concrete numbers were presented at trial, and there were no documents entered into evidence to support any of these figures. The court finds that the evidence is not sufficient to support this claim, and it is therefore denied.

### III. Conclusion

For the reasons outlined above, the court finds that RFCC properly terminated the contract on October 4, 2005. The court further finds that pursuant to the terms of the contract, Audubon owes RFCC $161,427.50 plus interest at the Louisiana legal interest rate from October 4, 2005 until paid. Audubon's claim for breach of contract is dismissed. Because RFCC did not

---

[29] *Safeco* at 416.

breach the contract, RFCC is not liable for costs of completion.

New Orleans, Louisiana, October 8, 2007.

*J. A. Brown*  
Jerry A. Brown  
U.S. Bankruptcy Judge